IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

HIPOLITO M. CHACOAN,

       Plaintiff,                 No. CIV S-05-2276 FCD GGH P

   vs.

DR. ROHRER, et al.,

       Defendants.      <u>FINDINGS & RECOMMENDATIONS</u>

_____/

I.  <u>Introduction</u>

      Plaintiff is a former state prisoner proceeding through counsel with a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that he received inadequate medical care while housed at California State Prison-Solano (CSP-Solano).  In particular, plaintiff contends that he lost all hearing in his left ear as a result of a delay in surgery.

      Pending before the court are summary judgment motions filed March 2, 2009, on behalf of defendant Naku and defendants Rallos, Thor and Traquina.  On April 2, 2009, a hearing was held regarding the pending motions.

      After carefully reviewing the record, the court recommends that summary judgment be granted as to defendants Rallos and Thor, and denied as to defendants Traquina and Naku.

1

II. Summary Judgment Standards Under Fed. R. Civ. P. 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its

2

contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

III. Legal Standard for Eighth Amendment Claim

      In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

      A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

      In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

\\\\\\

It is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the

5

medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." McGuckin, 974 F.2d at 1061.

IV. Undisputed Facts

At all relevant times, defendants Rallos and Naku were employed at CSP-Solano as primary care doctors. At all relevant times, defendant Traquina was employed at CSP-Solano as the Chief Medical Officer (CMO) and Health Care Manager (HCM). As CMO, his duties were to oversee clinic operation at all clinics and to respond to health care delivery problems presented by the institution staff or managers. As HCM, his duties were to manage the transfer of patients to or from other institutional and community providers. At all relevant times, defendant Thor was the Chief Physician and Surgeon at CSP-Solano. His duties were to evaluate the physician and surgical staff, medical records, physician compliance and to contract medical delivery and care.

Plaintiff was incarcerated at CSP-Solano from approximately September 2000 to the summer of 2008. While housed at the San Mateo County Jail before entering CSP-Solano in 2000, plaintiff experienced pain, blood and pus in his left ear. In the year 2000 before entering CSP-Solano, plaintiff experienced a hearing loss in his left ear of "like half."

On April 18, 2001, plaintiff was examined by ear specialist Dr. Hall, who diagnosed plaintiff as having chronic otitis media and externa on his left ear and a perforated ear drum. He prescribed Cipro and ear drops to resolve the flare-ups.

On July 23, 2003, Dr. Hall examined plaintiff again. This time, Dr. Hall diagnosed plaintiff as having chronic mastoiditis, which is an inflammation of the bone behind the ear in his left ear. Dr. Hall recommended that plaintiff obtain a computed topography (CT) scan of his mastoid area and a left side radical mastoidectomy, which is a surgical procedure to remove infected air cells from within the mastoid bone.

\\\\\

On July 24, 2003, the request for a CT and mastoidectomy were authorized.

On August 11, 2003, defendant Naku examined plaintiff for the first time in the Satellite Clinic. Plaintiff complained of a fever and a left earache which had been intermittent over the previous four years. Dr. Naku found that plaintiff had an inflamed left eardrum with abnormal drainage of fluid. Dr. Naku diagnosed plaintiff's condition as serious otitis media and prescribed antibiotics and Motrin. Dr. Naku also ordered a two-day lay in, allowing plaintiff to remain in his bed. Dr. Naku scheduled plaintiff for a follow-up appointment in one week, but the appointment would be with an available physician and not necessarily Dr. Naku.

On August 18, 2003, plaintiff saw Dr. Rohrer.

On August 20, 2003, Dr. Hall learned that plaintiff's CT had not been performed. He therefore re-ordered it, scheduling it for September 25, 2003.

On September 2, 2003, Dr. Naku again saw plaintiff in the Satellite Clinic where he complained of left ear pain and a fever. Plaintiff also said he was diabetic. Dr. Naku determined that plaintiff had otitis externa and a perforated ear drum on the left side. He prescribed a different antibiotic and Tylenol. He also scheduled plaintiff for a HBA-1C glycosylated hemoglobin test and random blood sugar tests to evaluate plaintiff for diabetes management. He also prescribed crepe soled shoes for comfort.

On October 1, 2003, plaintiff had a follow-up appointment with Dr. Hall. Dr. Hall again determined that plaintiff had chronic otitis/media/mastoiditis and cholesteatoma. He noted that the CT had still not been performed and issued a third request for the CT exam.

On October 2, 2003, Dr. Hall's third request for the CT exam was authorized by Christine Lambert.

Plaintiff's CT scan was performed on October 10, 2003.

On October 27, 2003, plaintiff saw Dr. Naku again, complaining of early morning stiffness, fatigue and knee, shoulder and hand pain. Plaintiff also complained of left ear pain and occasional fevers. Dr. Naku again noted plaintiff's left side perforated ear drum and tenderness

during the exam. Dr. Naku examined plaintiff's joints and his assessment was recurrent otitis media and possible rheumatoid arthritis. Dr. Naku scheduled several tests to evaluate plaintiff for arthritis or rheumatism. He also referred plaintiff for a consult with an ENT specialist and prescribed antibiotics for infection and ibuprofen for pain. After being informed that plaintiff had seen Dr. Hall on October 1, 2003, defendant Naku determined that referral to the ENT specialist was not necessary.

On April 29, 2004, Dr. Hall submitted a third request for plaintiff to have the mastoidectomy performed. On the "Physicians's Request for Services" form, Dr. Hall designated this surgery as urgent.

On June 23, 2004, Dr. Hall noted that the mastoidectomy had still not been performed. He concluded that plaintiff required a radical mastoidectomy of at the University of California San Francisco (UCSF) medical center. He then made a fourth request that the mastoidectomy be performed.

On July 24, 2004, plaintiff filed a first level 602 administrative appeal complaining that medical staff had failed to provide the requested surgery.

On August 3, 2004, Dr. Tan, a primary care physician, issued a referral for evaluation of plaintiff at UCSF/UCD, attaching Dr. Hall's earlier request.

On August 17, 2004, plaintiff was taken to UCSF for surgical evaluation. The UCSF specialist concluded that further treatment by antibiotics was "probably doom[ed] to failure," and ordered plaintiff to return for a follow up exam three weeks later to discuss surgery.

On September 29, 2004, Dr. Tan responded to plaintiff's administrative appeal. The response stated that plaintiff had been seen by Dr. Hall on June 23, 2004, and July 29, 2004, but did not address the fact that the surgery had not yet been performed. On October 10, 2004, plaintiff filed his appeal to the next level of review.

On November 22, 2004, defendant Rallos interviewed plaintiff in response to his administrative appeal. Among other things, plaintiff told defendant Rallos that he was sent to

UCSF in August 2004 and had been told to return in two weeks, but he had not yet been sent back. While gathering facts for the response to the appeal, defendant Rallos could not locate the examination records from UCSF. Defendant Rallos asked office staff to obtain the UCSF records.

On November 29, 2004, Dr. Rallos wrote a response to plaintiff's grievance stating that it was partially granted. She wrote that plaintiff had been seen by Dr. Hall twice in July and that on November 22, 2004, she submitted a referral for plaintiff to be seen at UCSF as soon as possible.

On December 10, 2004, plaintiff filed a second level appeal. Defendant Thor reviewed plaintiff's case for defendant Traquina to enable a response.

On January 22, 2005, defendant Traquina responded to the appeal as follows:

On November 22, 2004, you were interviewed by Dr. T. Rallos during the first level of appeal review. At that time, you were provided with an opportunity to fully explain your appeal issues. Additionally, an inquiry of your appeal was conducted which included a review of your Unite Health Record (UHR), applicable sections of California Code of Regulations (CCR) Title 15, and the Departmental Operations Manual (DOM).

Results of this inquiry revealed you were seen by Dr. Hall, ENT Specialist who did treat you, but also recommended that you be seen for a consultation with a specialist at the Otolaryngology Department at UCSF in San Francisco. You were seen by Dr. L. Lustig, from UCSF on August 17, 2004, but the response to the consultation request was delayed because it was mailed to a Dr. Jason Rohrer at a Vallejo, California address and Dr. Rohrer works at CSP-Solano. Your CAT scan was forwarded to UCSF and we rescheduled you to return to UCSF and hope you will return in time for your next scheduled appointment. I have been informed by Dr. Thor that he did write an order for you to receive antibiotics for our ear infection.

Based on the above findings, your medical issues have been addressed and there is no evidence to support your claim of being denied the opportunity to be seen by a specialist.

Determination: Based on the foregoing, your appeal is partially granted in that you have been rescheduled to return to UCSF for consultation.

From December 20, 2004, through February 8, 2004, plaintiff was temporarily transferred from CSP-Solano to another institution near Modesto so that he could appear in state

1   court.

2           On April 7, 2005, defendant Naku saw plaintiff who was experiencing a left

3   earache and fever.  Dr. Naku's examination revealed an inflamed left eardrum with purulent

4   secretions.  He assessed this as an acute episode of chronic otitis media and prescribed a course

5   of antibiotics to resolve the infection, Motrin for pain and Benadryl to dry secretions from his

6   ear.  Defendant Naku also requested a routine evaluation by an ENT specialist be expedited.

7           On April 15, 2005, plaintiff's mastoidectomy was performed.  Defendant Rallos

8   became aware that the discharge instructions from UCSF called for a follow-up with Dr. Lustig

9   at UCSF in one week.  Therefore, defendant Rallos requested that staff prepare a CDC 7243

10  Physician Request for Services form, asking that plaintiff be approved for his follow-up visit to

11  UCSF and advising that the request was urgent.  The request was approved and plaintiff was

12  scheduled to be seen by Dr. Lustig at UCSF on April 26, 2005.

13          On April 16, 2005, defendant Rallos checked to make sure that plaintiff receive

14  his follow up appointment at UCSF.  Defendant Rallos also ordered a follow up appointment at

15  CSP-Solano's Annex Clinic.

16          On May 25, 2005, Dr. Hall examined plaintiff who reported a loss of hearing on

17  his left ear.  Dr. Hall submitted an "urgent" request for a post operative evaluation with Dr.

18  Lustig, the UCSF otolaryngologist who performed the earlier surgery.  Dr. Hall's request was

19  approved and the appointment was scheduled for June 7, 2005.  Plaintiff did not attend this

20  appointment for reasons unknown.

21          On October 7, 2005, plaintiff was sent to UCSF for additional surgery as a further

22  attempt to restore hearing to the left ear.  The surgery was rescheduled for October 25, 2005,

23  because plaintiff had the flu.  The surgery was unsuccessful because plaintiff is now completely

24  deaf in his left ear.

25  \\\\\

26  \\\\\

V. <u>Discussion</u>

   *<u>Service</u>*

   At the outset, defendant Naku argues that plaintiff's opposition is untimely. Defendant Naku contends that plaintiff's counsel electronically filed and hand served the opposition on March 19, 2009, fourteen days before the April 2, 2009, hearing date. Defendant argues that Local Rule 78-230(c) provides that oppositions to motions are to be served by electronic service not less than seventeen days preceding the hearing date. Defendant Naku argues that plaintiff's opposition should be disregarded because it was served three days late.

   In the past, and presently in circumstances where an attorney is not registered for electronic service, personal service would permit a shortened opposition service time of fourteen days prior to the set hearing date. E.D. Cal. Local Rule 78-230(c). However, when an attorney registers for electronic service and does not opt out of electronic service, he waives the ability to personally serve. E.D. Cal. 5-135(g)(1). To add to the confusion, E.D. Cal. 6-136(a) allows an attorney to make personal service in addition to electronic service. What would be the point of this provision if not to give the attorney the ability to obtain the shorter service times for the filing of a motion or service of an opposition? The rules as presently written are defective and need to be amended. No sanction will be issued here because of the defective rules. Moreover, because defendant Naku has not demonstrated any prejudice by this three day delay in the filing of plaintiff's opposition, the court denies the request to strike the opposition and deems it timely.

   *<u>Merits</u>*

   In this action, plaintiff alleges that defendants acted with deliberate indifference by causing the delay in his receipt of the mastoidectomy that was performed on April 15, 2005. Plaintiff does not complain about treatment he received after this date.

   Defendants do not dispute that plaintiff had a serious medical need. Defendants also do not argue or provide evidence that plaintiff suffered no injury as a result of the delay in his receipt of surgery. Rather, they dispute whether they acted with deliberate indifference. The

court analyzes the claims against each defendant separately.

All defendants argue that they are entitled to qualified immunity. In resolving a claim for qualified immunity the court addresses two questions: (1) whether the facts, when taken in the light most favorable to plaintiff, demonstrate that the officer's actions violated a constitutional right and (2) whether a reasonable officer could have believed that his conduct was lawful, in light of clearly established law and the information the officer possessed. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987). Although the Supreme Court at one time mandated that lower courts consider these two questions in the order just presented, more recently the Supreme Court announced that it is within the lower courts' discretion to address these questions in the order that makes the most sense given the circumstances of the case. Pearson v. Callahan, --- U.S. ----, 129 S.Ct. 808, --- L.Ed.2d ----, 2009 WL 128768 (January 21, 2009).

A. Defendant Traquina

Defendants argue that defendant Traquina is entitled to summary judgment because his only involvement in plaintiff's care was in preparing the response to plaintiff's administrative appeal in January 2005. Because plaintiff had no right to an appeal process, defendants contends that defendant Traquina cannot be held liable simply because he reviewed the appeal.

Defendants also argue that once defendant Traquina became aware of plaintiff's case, he took steps to assure that plaintiff received his surgical consultation at UCSF as soon as possible. Because plaintiff was absent from CSP-Solano from December 20, 2004, to February 8, 2005, he could not order the surgery during that time. Defendants observe that plaintiff received his surgery just over 60 days after he returned to CSP-Solano.

In opposition, plaintiff disputes that defendant Traquina's only involvement in his care was in the preparation of the response to his administrative appeal in January 2005. Plaintiff alleges that on August 10, 2004, defendant Traquina submitted a "Request for

Authorization for Temporary Removal for Medical Reasons" form so that plaintiff would be able to leave the prison to visit UCSF for treatment. Plaintiff's Opposition, Sangster declaration, exhibit A. This document contains a signature line for defendant Traquina. Written next to his typewritten name is a signature, which plaintiff contends is defendant Traquina's. Plaintiff also contends that the August 17, 2004, "Outpatient Interdisciplinary Progress Notes" in plaintiff's medical records appears to be in defendant Traquina's handwriting. Id., Exhibit B. These notes state that plaintiff is to return to UCSF in one week. Id.

Plaintiff also argues that it was defendant Traquina's job to make sure that Dr. Hall's request that plaintiff receive the surgery did not "fall through the cracks." In support of this claim, plaintiff cites defendant Traquina's deposition testimony where he testified that as the CMO his job includes "[e]verything that is involving medical care, I have to look at the minutia, make certain that patient don't fall into the cracks, follow-ups and so forth. And so it's a very arduous task to be done by just the one person." Id., Exhibit I, p. 26. When asked how he made sure patients don't slip through the cracks, defendant Traquina responded, "By checking with the schedulers, getting aging reports." Aging reports state how many months have elapsed from the time an individual was scheduled for treatment. Id. at 26-27. These reports are prepared and reviewed on a monthly basis. Id.

In the reply filed March 26, 2009, defendants argue that the signature on the August 17, 2004, document is not that of defendant Traquina. In his declaration attached to the reply, defendant Traquina states that the signature on the August 17, 2004, Outpatient Interdisciplinary Progress Notes form is not his. He states that the signature on this form is most likely that of Dr. W. Franklin. Attached as exhibit B to defendant Traquina's declaration is a copy of a document containing Dr. Franklin's signature. Regarding defendant Traquina's signature on the August 10, 2004, form, defendants contend that there is no evidence that defendant's signature was anything more than routine approval of transportation involving no review of plaintiff's case whatsoever.

Defendants also argue that plaintiff's citation to defendant Traquina's deposition testimony regarding his review of aging reports was taken out of context. Defendants argue that at his deposition defendant Traquina went on to testify that the aging reports were often inaccurate. The court will quote defendant Traquina's testimony regarding this matter:

Q: How frequently do you review the aging reports?

A: When they are done in a monthly basis.

Q: So every month you review the aging reports which show how long it's been since somebody was scheduled–

A: Yes.

Q: –for a medical procedure?

A: That's correct.

Q: And you did that throughout the time you were the chief medical officer?

A: Yes.

Q: And does it–do the aging reports identify the inmates by name?

A: Yes, it does, and by number.

Q: And by number. That's the prison identification number?

A: Yes.

Q: And do the aging reports identify what procedures it is that they have been scheduled or are to be scheduled?

A: They don't say the procedure, they say the speciality: orthopedics, neurosurgery, ENT, urology, podiatry and so forth. You know, all specialities that we refer outside.

Q: How does reviewing the aging reports help you prevent any patients from falling through the cracks?

A: Not completely because the aging reports are a reflection of what is input in computer. If they are faulty, certainly that they are not one hundred percent and that's why some individuals, they fall into the cracks.

Q: Well, how frequently has it happened while you have been the chief medical officer that individuals fell through the cracks?

A: Often.

Q: How often?

A: I cannot precise 100 percent but it's something that–and more so then than now. The system that you have, the IMSATS is deficient.

Q: The system is deficient?

A: The IMSATS, that's the program that is for scheduling purpose, IMSATS.

Q: IMSATS?

A: Yes. Inmate statistics assessment and tracking, if I'm correct.

Q: So it's an acronym, I-M-S-A-T-S?

A: That's correct, IMSATS.

Q: Okay.

A: It's not satisfactory. So in March next year it will be replaced, we'll have it. It's something that is more friendly and provide us more accurate reports regarding the aging reports.

Q: So what is IMSATS?

A: IMSATS is the software that provides the tracking, the current tracking system that you have for scheduling patients for the clinics, for going outside and so forth. So when the system is deficient and then those things occur. You have the occasions that you have crashes of the computer and you've lost data. And this is something that has occurred. So if I can tell you in quantitate how often, I cannot quantitate because I really–I know that during the period that I've been there for now close to six years as a CMO, this is a reality.

Q: You regarded it as a common problem?

A: Yes, sir. And a great concern of me because I could not have a tracking system that would be reliable. And when you are dealing with a great population of close to 6000 individuals, you have a lot of sick people in that institution. So that is a concern that I have, yes, because I'm ultimate [sic] responsible and I want to have the resource to provide that.

Q: How long after you became the chief medical officer did you reach the conclusion that the IMSATS was inadequate and unreliable?

A: On my first year.

Q: Pardon me?

A: On my first year, which was in 2003. And so I was trying to curb this problem by keeping lists of problem–problem patients, particularly patients with diseases that could kill them. Cancer, one; more chronic care patients that are not

controlled properly. So I had approximately at that time three hundred or so individuals that so concerned because I knew that the system was faulty. And that I create that list based on reports given by my doctors. I meet my doctors every morning at 7:30. I was there this morning. Even coming here, I didn't miss that report because I feel that is very important. So I create that list. And the physician on call would receive every month an update of that list. So the one that was on call and you get a call from a nurse, you could check first if that individual was on that list because there's a lot of good information there to guide them to provide the better care to those individuals. That's my concern.

Q: So one of the problems with the IMSATS was that people would not be provided recommended medical care?

A: In general, they would receive medical care. But you ask me if there was individuals that would fall into the cracks, and those occurred and I'll know about those by several means. One, family that would call concerned. And I'll thank them for bringing to my attention. I'll get the charge, and that was a way. Other way was the inmates that would write to me. And the other way would be the appeals. So through those means I was able to review those charts and provide the care. So the appeal process is a good process because—

Q: The appeal process is a good process?

A: It is a good process and it helps me to avoid that the individuals will fall through the cracks.

Plaintiff's Reply, Exhibit Q.

Defendants sued in their individual capacity must be alleged to have: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or implemented a policy that repudiates constitutional rights and was the moving force behind the alleged violations. Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991); Hansen v. Black, 885 F.2d 642 (9th Cir. 1989); Taylor v. List, 880 F.2d 1040 (9th Cir. 1989). "Although a § 1983 claim has been described as 'a species of tort liability,' Imbler v. Pachtman, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L.Ed.2d 128, it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." Martinez v. State of California, 444 U.S. 277, 285, 100 S. Ct. 553, 559 (1980). "Without proximate cause, there is no § 1983 liability." Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

\\\\\

If defendant Traquina's only involvement in plaintiff's treatment was his review of plaintiff's second level appeal in January 2005, the court would find that he is entitled to summary judgment. This is because he could not have ordered that plaintiff receive the surgery while plaintiff was out-to-court from December 20, 2004, through February 2004. The type of court proceeding plaintiff attended is not clear from the record, although at oral argument it was suggested that it concerned a family law matter. Plaintiff received his surgery approximately two months after he returned to CSP-Solano. There is no evidence that this two month delay, preceded by the already approximately 1 ½ year delay from the date Dr. Hall originally recommended the surgery, caused plaintiff's injuries.

However, whether defendant Traquina's involvement in plaintiff's treatment was limited to his review of the appeal in January 2005 is a materially disputed fact. Most importantly, it is clear from defendant Traquina's job description and his deposition testimony that it was his job to make sure that plaintiff received the surgery. Why defendant Traquina was unable to ensure that plaintiff timely received his surgery is not addressed by defendants' motion. At his deposition, defendant Traquina suggested that a faulty computer system caused inmates to fall through the cracks. However, a faulty computer system does not explain why Dr. Hall's *four* approved requests for the surgery were not timely responded to. Without knowing what happened to Dr. Hall's four requests, i.e. what was the process for processing these requests, were they actually inputted into the IMSATS system, etc., the court cannot find that defendant Traquina did not act with deliberate indifference. Moreover, whether a faulty computer system would excuse defendant Traquina's failure to ensure that plaintiff timely received his surgery, as was his job, is an issue best left for a jury to decide.

The above testimony makes plaintiff's point. Evidently there was no effective policy to catch the scheduling mistakes, or just plain inaction. Knowing that there is an ineffective computer system does not relieve a manager of formulating some policy, manual or otherwise, to deal with the problem. Just throwing up one's hands is not a defense to liability.

17

This case is a poster child for demonstrating what happens when there is no policy to catch scheduling slip-throughs, or no policy for establishing follow-through. Dr. Hall, the specialist, had to request ear surgery four times or more, and the needed surgery took nearly *two years to be performed from the first request*.

Whether defendant Traquina signed the August 17, 2004, Outpatient Interdisciplinary Notes or on August 10, 2004, approved the request for plaintiff's transportation may be relevant to the bigger question of why defendant Traquina did not make sure that plaintiff received his surgery in a timely fashion. Because the bigger question has not been addressed, the court need not go into these side-issues any further at this time.

The *sine qua non* for qualified immunity requires a finding that the defendant could not have reasonably known that the law violated was clearly established. Pearson v. Callahan, __U.S.__, 129 S.Ct. 808 (2009). A defendant need not be presented with a precisely identical situation encompassed within a prior case finding a violation of law before it can be said that a reasonable person would know that he is violating clearly established law. Rather, when the law has been specifically defined to set the standards of conduct, factual situations (assuming those disputed facts in plaintiff's favor) which clearly would violate those standards preclude qualified immunity. See Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1131 (9th Cir. 2002).

Assuming the disputed facts in plaintiff's favor, it would be difficult to conceive of a situation where Dr. Traquina could reasonably assert that the law regarding his managerial policies, or lack thereof, which caused an untoward delay, was not clearly set within the parameters of law forbidding deliberate indifference to a serious medical need. Qualified immunity should be denied.

B. Defendant Rallos

Defendants argue that defendant Rallos should be granted summary judgment because he did not act with deliberate indifference when he reviewed plaintiff's administrative

appeal in November 2004.  The undisputed facts demonstrate that in preparing the response to plaintiff's appeal, on November 22, 2004, defendant Rallos submitted a referral for plaintiff to be seen at UCSF as soon as possible.

In his opposition, plaintiff argues that defendant Rallos acted with deliberate indifference when he responded to the appeal because his response was not timely and he downgraded the surgical request from "urgent" to "as soon as possible."

The appeal form indicates that it was received by defendant on October 12, 2004, and completed by him on November 29, 2004.  Plaintiff's Opposition, Sangster declaration, Exhibit F.  The form states that his response was due within fifteen working days of October 12, 2004, i.e. November 4, 2004.

It is not reasonable to infer that defendant Rallos' 25 day late response to the grievance constituted deliberate indifference.  Defendant has presented no facts that this rather inconsequential delay, in the entirety of the conduct at issue which would suggest that his ear condition became irreparable as a result of this particular delay.

Plaintiff's argument that defendant Rallos acted with deliberate indifference by downgrading the request from "urgent" to "as soon as possible" is without merit.  Plaintiff argues that in Jett v. Penner, 439 F.3d 1091 (9th Cir. 2006) the Ninth Circuit found virtually identical conduct unconstitutional.   In Jett, the Ninth Circuit found that the defendant doctor's decision to submit a "routine" request for an orthopedic consult 2 ½ months after his initial visit indicated deliberate indifference.  439 F.3d at 1097-1098.  Here, defendant Rallos' request that plaintiff be seen "as soon as possible" clearly did not downgrade the previous "urgent" request.  Actually, the "as soon as possible" request could be seen as a stronger request than the one marked "urgent" – certainly not weaker.

In responding to the request, defendant Rallos did not act with deliberate indifference.   Accordingly, defendant Rallos should be granted summary judgment.

\\\\\

C.  <u>Defendant Thor</u>

Defendants argue that defendant Thor should be granted summary judgment because he did not act with deliberate indifference in preparing the response to plaintiff's second level appeal, which defendant Traquina signed in January 2005.

In opposition, plaintiff argues that summary judgment as to defendant Thor should be denied pursuant to Fed. R. Civ. P. 56(f) which provides,

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) deny the motion;
> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
> (3) issue any other just order.

Plaintiff correctly points out that after counsel was appointed to represent him, the court on August 4, 2008, granted his motion for leave to conduct discovery but for the request to depose defendant Thor.  Plaintiff argues that defendant Thor was more involved in his care than just preparing the response to the second level appeal, as argued by defendants in their summary judgment motion.  Plaintiff alleges that on December 2, 2004, defendant Thor countersigned defendant Rallos' response to the first level appeal.  Sangster declaration, exhibit F.  Plaintiff argues that he should now be allowed to depose defendant Thor because his state of mind is now at issue because he denied knowing about plaintiff's condition prior to January 2005.

While plaintiff has demonstrated that defendant Thor was aware of his condition one month earlier than stated in his declaration, he has not demonstrated that defendant Thor knew of his condition any earlier than that.  Plaintiff has not, for example, cited any other portion of his medical records containing defendant Thor's signature.  That defendant Thor's declaration mistakenly states that he became aware of plaintiff's medical condition in January 2005 rather than December 2004 does not constitute a serious misrepresentation warranting reopening discovery.  For these reasons, the court finds that plaintiff has failed to demonstrate that he cannot present facts essential to his opposition.  His motion to deny defendant Thor's summary

judgment motion pursuant to Fed. R. Civ. P. 56(f) should be denied.

The court now turns to the merits of the summary judgment as to defendant Thor. As discussed above, defendant Rallos did not act with deliberate indifference in her November 2004 response to plaintiff's appeal when she wrote that she had referred plaintiff to be seen at UCSF as soon as possible. For the same reason, the court does not find that defendant Thor acted with deliberate indifference when he countersigned the appeal.

When he prepared defendant Traquina's January 2005 response to plaintiff's next appeal, plaintiff was out-to-court and could not be sent to UCSF for surgery. Plaintiff was sent to UCSF within two months of his return to CSP-Solano for the surgery. There is no evidence that this two month delay, preceded by the already 1 ½ year delay from the date Dr. Hall originally recommended the surgery, caused further injuries to plaintiff. Accordingly, defendant Thor should be granted summary judgment.

D. Defendant Naku

The court has detailed in the facts Dr. Naku's treatment of plaintiff. The stark fact outstanding reveals that Dr. Naku appeared oblivious to the treatment recommendations that a ear specialist had made. Dr. Hall recommended a CT scan and a mastoidectomy surgery; Dr. Naku kept diagnosing otitis media and prescribing continued inapposite medical treatment. If plaintiff proves the undisputed facts set forth herein, a fair inference is that Dr. Naku never cracked the medical records to see what a specialist had recommended, and the two treatments which should have been performed. At least as far as the record shows, Dr. Naku never expressed any disagreement with the Hall assessment or recommendations. Surely, if Dr. Naku had taken some affirmative action to implement the recommendations, e.g., go to his superior with an urgent recommendation, both the CT scan and surgery would likely have been performed much sooner that they were.

For these reasons both summary judgment on the merits and on the basis of qualified immunity should be denied.

1    For the reasons discussed above, defendant Naku should not be granted summary

2    judgment.

3            Accordingly, IT IS HEREBY RECOMMENDED that:

4            1.  Defendant Naku's summary judgment motion (no. 72) be denied;

5            2.  The summary judgment motion on behalf of defendants Thor and Rallos (no.

6    73) be granted;

7            3.  The summary judgment motion on behalf of defendant Traquina (no. 73) be

8    denied.

9            These findings and recommendations are submitted to the United States District

10   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

11   days after being served with these findings and recommendations, any party may file written

12   objections with the court and serve a copy on all parties.  Such a document should be captioned

13   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14   shall be served and filed within ten days after service of the objections.  The parties are advised

15   that failure to file objections within the specified time may waive the right to appeal the District

16   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

17   DATED: 05/14/09

18                                    /s/ Gregory G. Hollows
                                      _____
19                                    UNITED STATES MAGISTRATE JUDGE

20

21

22   ch2276.sj

23

24

25

26